THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LORI KING**<br><br>v.<br><br>**BOROUGH OF NEW HOLLAND,** *et al.* | CIVIL ACTION<br><br>No. 24-6628 |

**Henry, J.**                                                                                        **January 20, 2026**

### MEMORANDUM

    Lori King was, briefly, the first female police officer the Borough of New Holland had seen in more than fifteen years. During her first year on the job, King developed a "female related medical condition" demanding surgical repair. An administrator with the Borough said that the surgery was elective and would not entitle King to the Borough's disability coverage, so King requested accommodations while she recuperated. At the last moment before her one-year probationary period concluded and her work protections vested, and just before her approved leave for surgery, the police chief recommended to Borough Council that she be terminated and the Council so moved.

    King brought a complaint against the Borough Council, the Borough itself, and three municipal officers alleging violations of Section 1983, Title VII, the ADA, and the Pennsylvania Human Relations Act by different subsets of actors. In the present motion, groups of defendants move to dismiss claims under Section 1983 and against two individual defendants. For the reasons that follow, I grant the motion in part and deny it in part, permitting discovery to continue and requiring at least partial responsive pleadings.

1

I. **BACKGROUND**[1]

On or about November 11, 2021, Lori King was offered a position by New Holland Borough Manager J. Richard Fulcher as the first female police officer in the borough in the prior fifteen years. She started work on December 15, 2021. The following November, King notified her supervisor Police Chief William Leighty of an upcoming surgery related to a "female related medical condition." Compl. ¶ 27. The surgery, a tightening of her abdominal wall, would entail a recovery period estimated at three to six weeks during which King would be unable to wear her duty belt. She therefore requested the accommodation of lighter duty work during her recovery. Borough officials, however, explained that there was no longer a short-term disability insurance policy and the surgery would be considered elective. King would not be eligible for paid disability leave, so King would need to either use personal leave or take unpaid leave to cover the period. King alleges that Borough officials did not engage in any collaborative process with her to develop a plan for her leave and return, although she was (initially) approved for medical leave from December 14 to December 29, 2022.[2]

King was subject to a probationary hiring scheme in which new police officers are not afforded contractual protections until after they have worked at the department for a year. King's probationary year ended on December 14, 2022, the same day as her medical leave was set to begin. Five days prior, on December 9, 2022, King received word that Chief Leighty had not recommended her for full employment, *i.e.*, had recommended that she be let go prior to the close of

---

[1] At this level, I accept the factual content of the complaint as true. *See infra* § II. When I refer to the complaint (or "compl."), I mean the operative complaint as amended, filed at ECF 13.

[2] The complaint indicates that the approved medical leave was to end on December 29, 2023, a period of a year and two weeks. I presume, based on context and common sense, that it is a typo.

2

her probationary period. On December 12, 2022, the Borough Council adopted Chief Leighty's recommendation to end King's employment. On December 14, 2022, King was ultimately fired.

King claims that her firing was unlawfully discriminatory under federal and state law. She notes that she was treated worse than four male coworkers who were hired after her, including by Chief Leighty's treating the newer men as though they had greater departmental seniority than her and providing "light duty" accommodations as needed. She also alleges that the Borough and the police defendants retaliated against her after she exerted union protections in response to Chief Leighty's attempt to accord the newer men greater seniority.

In Count I, she sues the Borough of New Holland, the New Holland Borough Council, Fulcher, Chief Leighty, and Borough Mayor Timothy Bender under 42 U.S.C. § 1983, alleging deprivation of her "liberty, property, and due process rights and protections," compl. ¶ 72, in addition to her rights to equal protection and free speech. In Count II, she sues the borough and Borough Council under the antidiscrimination protections of Title VII of the Civil Rights Act of 1964 ("Title VII"). In Count III, she sues the borough and the Borough Council under the Americans with Disabilities Act (ADA). Finally, in Count IV, she sues the borough, the Borough Council, Fulcher, Leighty, and Bender under the Pennsylvania Human Relations Act (PHRA).

On April 24, 2025, the defendants moved to partially dismiss the complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In particular, the defendants moved to dismiss 1) the claims under § 1983 in their entirety, and 2) the claims under § 1983 and under PHRA against Bender and Fulcher. On December 1, 2025, I issued an order permitting discovery to proceed on the counts against which no motion lay.

## II. FRAMEWORK

To survive a motion to dismiss under Rule 12(b)(6), a complaint must set forth facts that raise a plausible inference that the defendant inflicted a legally cognizable harm upon the plaintiff. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "[S]tating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quotation marks and citations omitted). The rule "does not permit dismissal of a well-pleaded complaint simply because it strikes a savvy judge that actual proof of those facts is improbable." *Id.* (quotation marks omitted).

## III. DISCUSSION

### A. Section 1983 Claims Regarding Probationary Employment

The defendants first claim that, because King was a probationary employee at the time she was fired, she lacked a property interest in her continued employment, and therefore she cannot sue under Section 1983.

I first determine the scope of the bases of King's complaint under § 1983, which is not itself a source of rights but only a mechanism by which a plaintiff may pursue those rights. *Hildebrand v. Allegheny Cty.*, 757 F.3d 99, 104 (3d Cir. 2014). Some rights, however, cannot be vindicated through Section 1983 because Congress has chosen to attach an alternative "comprehensive remedial scheme." *Williams v. Pennsylvania Hum. Rels. Comm'n*, 870 F.3d 294, 298 (3d Cir. 2017). This includes claims under Title VII and the ADA, *id.* at 298–300, which King includes as separate counts. Other than these, King does not refer directly to any statutory rights underlying her § 1983

claim, referring solely to constitutional rights under the 14th Amendment (due process and equal protection) and under the 1st Amendment (retaliation for exertion of union rights).

The defendants argue that, because *probationary* employment is not secured by federal law, § 1983 is wholly unavailing. Section 1983 provides,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

Section 1 of the Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." The Third Circuit has held that a probationary employee, however, *ipso facto* lacks a proprietary interest in her job, and therefore the Due Process Clause does not protect her from the loss of that job. *Thomas v. Town of Hammonton*, 351 F.3d 108, 113 (3d Cir. 2003). King responds that her claims are "NOT limited to denied property interests under Section 1983[,]" but she asserts only that the case law on which the defendants rely is "irrelevant summary judgment case law." Pl's Resp. 16. Since King was, at the time of her firing, an at-will employee, she cannot state a claim under the Due Process Clause for the loss of her job.

The defendants' argument from King's probationary status does not reach King's further claims under § 1983 sounding in equal protection and free speech. Although these claims are given only the sketchiest treatment in the complaint, the motion to dismiss does not mention them at all. I decline to make the motion on defendants' behalf.

### B.  Section 1983 Claims under, Or in the Style of, *Monell*

Next, the defendants argue that King's reference to "policies, practices and customs" at various points in Count I under Section 1983 make claims under *Monell v. N.Y. City Dep't of Soc.*

5

*Servs.*, 436 U.S. 658 (1978), that should not survive even at this level. Under *Monell*, a municipality may be held liable for either unconstitutional customs and policies or failures to train or supervise or discipline that amount to "deliberate indifference to the constitutional rights" of a plaintiff. *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019). Such liability does not mirror *respondeat superior* in other areas of tort wherein an employer may be liable for the torts of its employees. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 289 (3d Cir. 2018). As the defendants point out, a plaintiff must show that "a reasonable municipal policymaker had contemporaneous knowledge of the offending occurrence or knowledge of a pattern of prior incidents or knowledge of similar violations of constitutional rights and failed to take adequate measures to ensure the particular right in question or otherwise communicated a message of approval to the offending subordinates." *Garcia v. County of Bucks,* 155 F.Supp.2d 259, 268 (E.D. Pa. 2001); *accord Simmons v. City of Philadelphia*, 947 F.2d 1042, 1064 (3d Cir. 1991). The defendants also argue that the complaint essentially relates to a single incident, which would not support a finding of a practice. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 824–25 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").

In response, King argues that she was "denied equal enforcement of New Holland Borough and New Holland Police Department policies, customs and procedures," and that the defendants "were deliberately indifferent to civil rights in general" across several broad areas of policies like seniority, "disability/medical coverage," "discipline/performance improvement," "disability accommodation," "discrimination/equal opportunity," and "customary practice to accord preferential

6

treatment to male officers." Pl's Resp. 19–20; compl. ¶¶ 56, 77 (repeating from ¶ 56 all but the last and then adding the last).

The closest King comes to identifying specifically the policy, practice, or custom with which she takes issue is 1) her allegation of a "customary practice to accord preferential treatment to male officers," *id.* ¶ 77, and 2) her allegation that "light duty" was provided to male officers who requested it in similar circumstances. In support of the first conclusion, the only relevant factual allegations are that she was the only woman police officer 1) hired around the same time as four other new police officers who were all men, 2) in a police force totaling nineteen police officers, and 3) hired in the previous fifteen years or more, *id.* ¶¶ 16–18; also, that Leighty "attempted to bump-up seniority for the male hires even though the female plaintiff was hired first, the first at work, and therefore the most senior new hire[,]" ¶ 21; and that she was terminated on an apparent pretext, ¶¶ 36, 38–40. These allegations more directly support an inference that there was a discriminatory preference for men in *hiring*. The connection to an inference of a "customary practice of preferential treatment" in other areas is much more attenuated, since until King's hiring, there no women officers around who could have gotten the shorter end of the stick. Nevertheless, the New Holland defendants do not raise that concern, and I find that it sufficiently crosses from conceivable to plausible under the circumstances and permit the *Monell* claim to proceed.

As to King's suggestion that "light duty" was permitted for male officers but not for her, she offers the assertion that the accommodation was made available only to men, but she cites only an email in which Leighty concedes that he granted it previously to a male officer—one whose request was for a much shorter period, one which Leighty says corresponded with a departmental need for a particular light duty task. *See* compl. ex. J (ECF 13-11).

7

The defendants' argument that King's termination is insufficient to prove out a *Monell* claim because it represents a single incident fails. The relevant rule from *Tuttle* (as reproduced in *Groman v. Twp. of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995), cited by defendants) applies differently based on the nature of the municipal policy in question. Where a policy by its terms violates constitutional rights, a single application is sufficient under *Monell*. *Tuttle*, 471 U.S. at 822. Where a policy is more "nebulous" and "not susceptible to such easy proof," such as the failure of a city to adequately train its employees, "evidence [must] be adduced which proves that the inadequacies resulted from conscious choice." *Id.* at 822–23. The "customary practice to accord preferential treatment to male officers" is "more nebulous," but by that same quality, it might be inferred from a broad swath of factual allegations. Here, the established failure to hire a single woman over the course of such a long time combined with the apparently pretextual firing of that woman provides adequate factual content at this level to infer a broad customary preference for male officers that affected the present termination. To rule otherwise would permit a department to evade liability under *Monell* for discriminatory customs by avoiding ever hiring a member of an unwanted group. *Tuttle* and *Groman* therefore do not preclude this "single incident" from proceeding under *Monell*.

Finally, the complaint includes not only municipal person defendants in its claims under Section 1983 but also Fulcher, Leighty, and Bender. These three are certainly "persons" under Section 1983 with or without *Monell*, and they do not claim that they could not be liable under the same discriminatory custom theory as survives against the municipal defendants.[3]

---

[3] Leighty does not move to dismiss the claims against him.

### C. Claims against Bender and Fulcher: Personal Involvement and Immunity

Finally, Timothy Bender and J. Richard Fulcher challenge the counts against them under Section 1983 and the Pennsylvania Human Relations Act (PHRA) by arguing that they were insufficiently personally involved in the challenged conduct and based on qualified and high official immunity.[4]

#### 1. Personal Involvement by Bender

Timothy Bender argues that he was made defendant only because of his position as mayor of New Holland. He notes that he was included only minimally in the complaint and its exhibits, reducing to 1) his mayoralty over New Holland Borough, and 2) his receiving an electronic carbon copy on an email announcing King's hiring. In response, King argues that "Defendant Mayor Bender supervised the Police Chief Leighty so obviously Defendant Bender was involved with the 'recommendation' decision to terminate the female plaintiff then rubberstamped by the Borough Council." Pl's Resp. 21–22. According to the complaint, "Defendant Mayor Timothy Bender supervised Defendant William Leighty[,] the Chief of the New Holland Police Department," and "Defendant Leighty was a decision maker pertaining to Plaintiff King's terms and conditions of employment." ¶ 12.

Supervisors may incur liability through their own actions, but there is no mere supervisory liability under Section 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*"); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (noting that "[a]llegations of participation or actual knowledge and acquiescence, however, must be made with

---

[4] Because I dismiss Bender and Fulcher for lack of their personal involvement, their own first raised objections, I do not reach their claims of immunity.

appropriate particularity"). Holding Bender liable without any direct allegation of his participation in the setting of policy would violate that rule.

Whether supervisory liability may attach under the PHRA is not so clear. Bender and Fulcher cite the same Third Circuit precedent for analyzing this under Section 1983 as PHRA, but whether that analysis regarding "a civil rights action" should be taken to include the state claim is dubious, since that case included two federal civil rights counts but no state law counts. *Rode*, 845 F.2d at 1197 (case concerned charges under § 1983 and its partner statute § 1985, a federal civil rights obstruction count); *see id.* at 1207–08 (making no direct reference to the PHRA and citing only federal decision). Furthermore, the same court in *Dici v. Comm. of Pennsylvania* negated summary judgment for a supervisor based on the paragraph of PHRA concerning "aiding and abetting discriminatory practices." 91 F.3d 542, 553 (3d Cir. 1996); *see* 43 P.S. § 955(e) (providing liability for "any person, employer, employment agency, labor organization or employe, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice").

Some confusion here may arise because of the breadth of the theories incorporated into the PHRA count. In ¶ 103, King claims that "[t]he conduct by Defendants described above constituted violations of the Pennsylvania Human Relations Act." Then, in ¶ 104, King claims that Fulcher, Leighty, and Bender "were decision makers who aided and abetted discrimination directed at" her. The PHRA itself provides numerous rights that might be violated. In general, its analysis mirrors that of Title VII, and that precludes the individual liability except under, *inter alia*, the aiding and abetting paragraph at § 955(e). *Dici*, 91 F.3d at 552; *see Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1077 (3d Cir. 1996) ("Congress did not contemplate that such damages would be assessed against individuals who are not themselves the employing entity."); *see also* compl.

10

¶¶ 81–84 (Title VII claim brought only against Borough itself and Borough Council). The most straightforward analysis of the PHRA claim is therefore that it 1) mirrors in ¶ 103 under state law the Title VII claim under Count II against the Count II defendants, and 2) makes a claim in ¶ 104 against Fulcher, Leighty, and Bender under § 955(e).

The PHRA case against Bender is therefore not premised on mere supervisory liability, which application would be plausible but dubious, but instead on an affirmative act by Bender "to aid, abet, incite, compel or coerce the doing of any act," which violates the act if done by "[a]ny person." Section 955(e). *Dici*, 91 F.3d at 553. However, the complaint offers no factual content off which I can reasonably infer any such direct actions. I therefore dismiss the Section 1983 and PHRA claims against Bender for related reasons.

2. *Personal Involvement by Fulcher*

J. Richard Fulcher separately argues that he too should be dismissed because he had no personal involvement in King's termination. His participation was limited to 1) his position as "Borough manager" overseeing daily operations and administration, which made him 2) "a decision maker pertaining to Plaintiff King's terms and conditions of employment," compl. ¶¶ 11–12, and 3) another supervisor of police chief Leighty and of Borough administrator Kim Raptosh, *id.* ¶ 28. Fulcher notes that the exhibits attached to King's own complaint include minutes from the Council meeting at which a motion for King's termination was made and passed, which demonstrates not only that Fulcher did not make the motion or recommend it, but that he did not vote on the motion. Compl. Ex. F (ECF 13-7). King responds by arguing that Fulcher "was a decision maker regarding Plaintiff's disability benefits and a decision maker to terminate Plaintiff's employment, and he denied her due process rights including no union representation when she met with the Borough Council." Pl's. Resp. 21. She asserts that the complaint alleges that "Bender

11

and/or Fulcher were policy makers and decision makers to deprive plaintiff of equal benefits of employment and wrongfully terminate her from employment." *Id.* at 22.

As to Fulcher, the complaint alleges that he "administered and oversaw all Borough policies and procedures including disability, leave, and accommodation policies." ¶ 28. It goes on to allege that "Borough administrator Kim Raptosh was supervised and reported to Borough Manager Fulcher," and indicates that the Borough administration communications regarding the termination came through Raptosh. *Id.* There are no facts alleged as to whether Fulcher was himself responsible for creating policy or whether he was responsible for the (somewhat nebulous) challenged policy. No allegation indicates facts that might suggest Fulcher's awareness of a longstanding customary preference for male police officers, such as his longstanding tenure in his position, his review of other decisions or policy applications that indicated that bias, or suggestion of his own injecting bias or custom. And the complaint separately refers to "Defendant Leighty's decision/recommendation not to terminate the female Plaintiff's employment," at which time "Leighty acted individually and acted on behalf of the Borough of New Holland and on behalf of the New Holland Borough Council"—that is to say, not evidently on behalf of Fulcher. ¶ 12. In the full context of the complaint, I therefore dismiss Fulcher as a defendant as to Section 1983.

Finally, because there is no allegation tying Fulcher personally to explicit acts "to aid, abet, incite, compel or coerce the doing of any act," as with Bender before him, I dismiss the PHRA claim against Fulcher.

### IV. CONCLUSION

For the reasons given above, I will issue an order granting in part and denying in part the motion to dismiss. Because it is conceivable that King may provide allegations whose factual

content cures some of the defects above, I grant her leave to amend the complaint only insofar as it might cure those claims I dismiss without prejudice.